AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**NORTHERN** DISTRICT OF **CALIFORNIA**

FILED
JUN 29 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES OF AMERICA

V.

THOMAS RICHARD WILLIAMS and
RAFAEL MIRANDA

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 07-70388 WDB

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __June 28, 2007__ in __Contra Costa__ county, in the __Northern__ District of __California__ defendant(s) did, (Track Statutory Language of Offense) conspire to commit any offense against the United States _as set forth in 26 USC §§ 5861(d) + (i)._

in violation of Title __18__ United States Code, Section(s) __371__

I further state that I am a(n) __FBI Special Agent__ and that this complaint is based on the following
Official Title

facts:

See attached Affidavit

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

Approved
As To
Form:  _____
    AUSA: Michelle Morgan-Kelly

Name/Signature of Complainant:   Doug Hunt

Sworn to before me and subscribed in my presence,

__6/29/07__                                         at         Oakland, California
Date                                                                City and State

Hon. Wayne D. Brazil
United States Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

UNITED STATES DISTRICT COURT            )
                                        ) ss:
NORTHERN DISTRICT OF CALIFORNIA         )

### AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Doug Hunt, Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

I.   **INTRODUCTION**

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since October of 1995. I am currently assigned to the Violent Crimes and Major Offender Squad at the Oakland Resident Agency, San Francisco Field Office, where my responsibilities involve the investigation of gangs, narcotics trafficking and firearms offenses. During my tenure in the FBI, I have been involved in numerous investigations involving the illegal possession and use of firearms. I have participated in physical and electronic surveillance and undercover transactions, executed search warrants, and reviewed recorded countless conversations of individuals involved in the illegal use of firearms. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

II.  **PURPOSE OF AFFIDAVIT**

2. This affidavit is being submitted in support of a criminal complaint and arrest warrants. As set forth below, there is probable cause to believe that THOMAS RICHARD WILLIAMS and RAFAEL MIRANDA have violated 18 U.S.C. § 371, conspiracy, by conspiring to receive or possess unregistered handguns and silencers with obliterated serial numbers in violation of 26 U.S.C. §§ 5861(d) and (i).

3. This affidavit is submitted for the limited purpose of securing the requested complaint and arrest warrants, and therefore, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that a violation of 18 U.S.C. § 371 has occurred.

### III. STATUTORY AUTHORITY

4. 18 U.S.C. § 371 makes it a crime for two or more persons to conspire to commit any offense against the United States, and for one or more of such persons do any act to effect the object of the conspiracy.

5. 26 U.S.C. § 5861(d) makes it a crime to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record.

6. 26 U.S.C. § 5861(i) makes it a crime to receive or possess a firearm which is not identified by a serial number as required by Chapter 53.

7. 18 U.S.C. § 921(a)(3) defines "firearm" to include "(A) any weapon (including a starter gun) which will or is designed to or may readiliy be converted to expel a projectile by the action of any explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device."

8. 18 U.S.C. § 921(a)(24) defines a "firearm silencer" to mean "any device for silencing, muffling or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

//

IV.  **PROBABLE CAUSE**

**Background on CW-1**

9.  In April, 2007, Detective Michael P. Brown of the Oakland Police Department told me that within the preceding several months, he had received information from a cooperating witness (hereafter referred to as "CW-1") concerning THOMAS RICHARD WILLIAMS. Detective Brown has known CW-1 for several years. During that time, Detective Brown is not aware of any instances in which CW-1 has provided false information. Detective Brown considers the information provided by CW-1 to be reliable, however, his information has rarely been used in investigations because it typically has not related to criminal activity.

10. Since April 2007, I have met with CW-1 on dozens of occasions. I have confirmed the information CW-1 has given me on those occasions. I am not aware of any occasion on which CW-1 has provided false information. I consider the information provided by CW-1 to be reliable. During the time I have known CW-1, the FBI has paid CW-1 approximately $150 for expenses. I have reviewed CW-1's criminal history. CW-1 was convicted of a misdemeanor in 2002 for tampering with a vehicle.

**Information from CW-1 regarding "THOMAS RICHARD WILLIAMS"**

11. CW-1 indicated that he has known WILLIAMS for nine years. CW-1 was able to identify WILLIAMS from a photographic lineup conducted by Detective Mike Brown on March 26, 2007.

12. CW-1 indicated that he/she is in frequent contact with WILLIAMS via telephone. CW-1 indicated that in telephonic conversations with WILLIAMS in March 2007, WILLIAMS began asking CW-1 about firearms. WILLIAMS told CW-1 he had acquired a .357 revolver and a .45 caliber semiautomatic pistol, but they were too large to accommodate

3

"suppressors." WILLIAMS told CW-1 that he needed two .22 caliber semiautomatic handguns with silencers. WILLIAMS specified that he wanted the suppressors "machined into the barrels" and provided some specifications. WILLIAMS specifically asked if CW-1 could get them for him. CW-1 indicated he told WILLIAMS that he might be able to comply with the request.

13. WILLIAMS told CW-1 he needed these type of weapons outfitted with suppressors for a specific purpose. From their conversation, CW-1 believed that WILLIAMS was planning to use these weapons in a robbery/homicide. WILLIAMS told CW-1 that WILLIAMS and an unknown subject, possibly a "high risk financier" or loan shark from Southern California, were planning to meet a money courier in Florida. CW-1 also believed from his conversations with WILLIAMS that the money courier would be coming to the meeting from outside of the United States. CW-1 believed that WILLIAMS and the loan shark were planning to rob and kill the money courier. CW-1 did not know the identity of the loan shark.

14. CW-1 did not know exactly when WILLIAMS and the loan shark were planning to commit this offense, but believed it would occur within two weeks. CW-1 sensed an urgency in the requests by WILLIAMS to obtain the suppressed weapons. CW-1 believed WILLIAMS was just waiting to acquire the silenced handguns and that the offense would occur shortly thereafter. WILLIAMS invited CW-1 to participate with him in the robbery in order for him to "make some big money." WILLIAMS told CW-1 that "four people may be going to this meeting, but only three will be leaving."

15. CW-1 said that WILLIAMS called him on March 25, 2007 and reemphasized his need for two .22 caliber suppressed semi-automatic handguns.

16. On March 30, 2007, CW-1 placed a consensually monitored and recorded telephone call to (619)980-6364, the number at which he typically contacted WILLIAMS. In this call, CW-1 told WILLIAMS that he thought he/she would be able to provide two handguns. CW-1 indicated the handguns would be either Walthers or Berrettas. CW-1 also indicated the cost for the two weapons would be $5,000. WILLIAMS indicated this

amount would be fine, but he would talk to his partner that night and would call CW-1 the following day. CW-1 indicated that he would be interested in making some of the big money that WILLIAMS mentioned previously. WILLIAMS agreed and said that CW-1 had the "sand" for that type of work and that WILLIAMS would be there with CW-1. CW-1 asked what would be required. WILLIAMS replied that he would be in the Bay area the following week and they would talk about it then. WILLIAMS reiterated that he would be in the Bay area to give CW-1 the money.

17. On March 31, 2007, CW-1 received a phone call from (619)980-6364, the number he associated with WILLIAMS. This phone call was also consensually recorded. In this call, WILLIAMS asked CW-1 what type of handguns he could provide. CW-1 indicated they would be either Walthers or Berrettas. WILLIAMS asked which one of those he would recommend. CW-1 indicated that either would be good. WILLIAMS indicated that he would talk to his partner the following Monday and he would call CW-1 back on Tuesday (April 3, 2007). WILLIAMS indicated that he would pick the guns up from CW-1 in the Bay Area.

18. Throughout the month of April, 2007, additional monitored phone calls were made during which CW-1 and WILLIAMS further discussed the arrangement for WILLIAMS to pay CW-1 $5,000 for two silenced handguns. During at least one of these calls, WILLIAMS indicated that he wanted the serial numbers removed from the weapons.

### Delivery of $5,000 by THOMAS WILLIAMS to CW-1 on May 6, 2007

19. On May 6, 2007, CW-1 placed two consensual monitored telephone calls to WILLIAMS at (619)980-6364 in the presence of SA Ken Bagchi. The purpose of these phone calls was to ascertain when WILLIAMS would be arriving at the Harris Ranch Restaurant near Coalinga, California, the meet location arranged by CW-1 and WILLIAMS for the exchange of the money. Prior to the meeting, CW-1 was searched for weapons, contraband, and money with negative results. In addition, the FBI vehicle in which he was to travel to the meet location, which was equipped with audio and video recording devices, also was searched with negative results. CW-1 was provided with photographs

5

of two silenced handguns.

20. At approximately 11:49 a.m., I observed WILLIAMS arrive at the Harris Ranch Restaurant and enter the restaurant. I observed CW-1 go into the restaurant, emerge a short time later with WILLIAMS, walk to the FBI vehicle with WILLIAMS, drive a short distance with WILLIAMS, and park next to WILLIAMS' vehicle. A short time later, WILLIAMS got into his vehicle and left.

21. Upon returning to the debriefing location, CW-1 once again was searched with negative results. The recording devices were recovered from the FBI vehicle and subsequently placed into evidence. Additionally, CW-1 directed agents to $6,000 in cash in the console of the vehicle. The $6,000 in cash provided to CW-1 by WILLIAMS was photographed in place and then recovered from the center console of the FBI vehicle.

22. CW-1 told me that when WILLIAMS arrived at the restaurant, they spoke about individuals they knew in common and football. CW-1 stated that he then gave WILLIAMS a ride to his car in the restaurant parking lot. WILLIAMS stated that the car belonged to his partner. WILLIAMS said he met his partner when he was coaching football at Midway Baptist High School, where his partner had been a student. WILLIAMS indicated that his partner would be providing details about the anticipated robbery.

23. WILLIAMS also indicated the robbery would be for approximately $7,000,000 and would take place within a month. WILLIAMS told CW-1 that he could make $40,000 for one night of work.

24. According to CW-1, while in the FBI vehicle, WILLIAMS looked at the photographs of silenced pistols provided by CW-1. Thereafter, WILLIAMS gave CW-1 $6,000; $5,000 for two silenced .22 caliber pistols and $1,000 for a previous debt.

25. I have reviewed the audio and video recording made of the transaction on May 6, 2007. The recording clearly shows WILLIAMS looking at pictures of two silenced pistols that I provided to CW-1, and clearly shows WILLIAMS giving CW-1 a large amount of cash.

//

**Description of Weapons for Controlled Delivery**

26. In anticipation of providing the silenced weapons to WILLIAMS and his partner, I obtained from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) three weapons matching the specifications provided by WILLIAMS. In so doing, I also discussed the specifications of the firearms with ATF Special Agent Thomas Cunningham, who is a firearms interstate nexus expert and has been so qualified to testify in the Northern and Eastern Districts of California. The weapons to be provided to WILLIAMS and his partner were as follows:

   a. Two .22 caliber Ruger semi-automatic pistols with affixed silencers. The serial numbers had been obliterated from the pistols and the silencers had no serial numbers.[1]

   b. One .22 caliber Walther semi-automatic pistol with a detachable silencer. Both the pistol and the silencer bore serial numbers.

27. SA Cunningham confirmed that none of these weapons or silencers are registered in the National Firearms Registration and Transfer Record.

28. I have spoken with SA Cunningham regarding the location of manufacture for these weapons. According to SA Cunningham, Ruger pistols are manufactured in either Arizona or Connecticut. Walther pistols are manufactured in Alabama. The affixed silencers were hand-fashioned from pieces of metal tubing.

**Arrest of WILLIAMS and MIRANDA on June 28, 2007**

29. During monitored telephone conversations between CW-1 and WILLIAMS during May, 2007, arrangements were made for CW-1 to deliver the silenced weapons to WILLIAMS. WILLIAMS indicated that his partner would accompany him when he received the

---

[1] These pistols were seized by the ATF in a prior criminal investigation. At the time of their seizures, the serial numbers had been obliterated and they had been permanently affixed with silencers, which also bore no serial numbers. For ATF internal tracking purposes in order to use the handguns and silencers in this and other undercover operations, the ATF placed their own tracking numbers on the interior of the weapons. These numbers can only be seen if the weapons are disassembled.

7

weapons. After some deliberation about the location of the exchange, WILLIAMS and CW-1 agreed that WILLIAMS and his partner would drive to the Bay Area to receive the weapons. CW-1 also told WILLIAMS that they could conduct a potential robbery in the Bay Area. WILLIAMS indicated he had a potential robbery target in San Diego. WILLIAMS indicated that he and his partner would drive to the Bay Area from Southern California, rather than fly, to avoid leaving a paper trail.

30. At my direction, CW-1 made hotel arrangements for WILLIAMS and his partner at the Doubletree Inn in Livermore, California for the evening on June 27, 2007. At approximately 9:30 p.m. on June 27, 2007, CW-1 received a call from WILLIAMS' telephone number from a person who identified himself as "RAFAEL." RAFAEL asked for directions to the hotel and indicated that he and WILLIAMS were just north of San Clemente and would be arriving early on the morning of June 28, 2007.

31. At approximately 10:00 a.m. on June 28, 2007, CW-1 placed a telephone call to WILLIAMS and asked him to meet at a restaurant in Crockett, California, in Contra Costa County. CW-1 said he had "presents" for WILLIAMS and that the restaurant was near the residence of the potential robbery target that they previously had discussed. CW-1 was equipped with an audio recording device and was searched for money, weapons and contraband with negative results. CW-1 again was provided with the FBI vehicle, which was equipped with an audio and video recording device, and was instructed to go to the restaurant. He also was provided with a box containing three silenced handguns, including two Rugers and one Walther pistol fitted with silencers.

32. At approximately 11:15 a.m., surveillance units observed WILLIAMS and another male arrive in a silver Mercedes at the Nantucket Restaurant in Crockett, California. A short time later, CW-1 was observed meeting with those individuals and entering the restaurant. Undercover officers in the restaurant observed CW-1, WILLIAMS, and the other male eat a meal together. CW-1, WILLIAMS, and the other male later emerged from the restaurant and sat in the FBI vehicle in the restaurant parking lot.

33. While they were in the vehicle, I observed CW-1 retrieve the box containing the three

silenced weapons from the rear of the vehicle and take it into the passenger compartment. Over the audio recording device, I heard CW-1 say that these were the silenced weapons they had requested and that the serial numbers had been removed as they had requested. CW-1 also stated that a third weapon had been provided as a "bonus." CW-1 specifically pointed out that unlike the Rugers, the third "bonus" weapon, the Walther, had not had its serial numbers removed.

34. I heard WILLIAMS say, "These will work," and tell CW-1 he had done a "good job" obtaining the weapons. I heard the other male state that he had information about large amounts of cash being transferred from Atlanta, Georgia, to the West Coast. Thereafter, WILLIAMS told CW-1 that he wanted to go take a look at the residence of the potential robbery target. CW-1 asked if they wanted to transfer the weapons to their vehicle, and WILLIAMS said they were fine where they were. As CW-1 pulled the FBI vehicle out of the parking lot, the three were arrested.

35. WILLIAMS later was given his *Miranda* warnings, which he waived. WILLIAMS stated that he had made a big mistake coming to the meeting and "knew better." He stated that the purpose of the meeting was to connect his partner, RAFAEL MIRANDA, with CW-1 to arrange the exchange of the firearms. WILLIAMS said MIRANDA wanted to meet CW-1 because MIRANDA believed it was suspicious that CW-1 was stalling on the delivery of the weapons. WILLIAMS admitted that the money already had been paid for the firearms and acknowledged that the weapons were suppressed. WILLIAMS said that suppressed weapons would be very useful for committing robbery and murder. WILLIAMS further admitted he was a felon and was not allowed to possess weapons because he was a felon. He stated that the $6000 that he paid to CW-1 came from MIRANDA. He was not certain why MIRANDA wanted the weapons. He admitted that he had discussed potential robberies with CW-1, including the potential robbery of a money courier about whom MIRANDA had told him, the Bay Area target identified by CW-1, and an individual in San Diego.

36. MIRANDA was given his *Miranda* warnings and waived them. MIRANDA initially

claimed that he accompanied WILLIAMS to the Bay Area with the expectation that he would be arranging financing for the purchase of a property for one of WILLIAMS' acquaintances. MIRANDA then admitted that he had accompanied WILLIAMS to meet CW-1. MIRANDA said he previously provided WILLIAMS with $7000 to purchase two silenced weapons, and that he told WILLIAMS that while MIRANDA would not personally be involved in robberies, he would provide WILLIAMS with information on individuals with large amounts of cash who would be worthy robbery targets. MIRANDA stated that he knew that silenced weapons would be useful for killing people. MIRANDA said he thought that proceeds from the robberies would be split evenly between himself, WILLIAMS, and CW-1. MIRANDA said he knew a robbery would not occur the day they obtained the weapons because he knew that WILLIAMS would want to study the target before taking that type of action. MIRANDA said he believed WILLIAMS was a very dangerous man, and knew he was a twice-convicted felon.

**Criminal History of THOMAS RICHARD WILLIAMS**

37. On June 13, 2007, I reviewed a criminal history for WILLIAMS. The criminal history indicates that WILLIAMS was convicted in 1974 of Grand Theft, convicted in 1977 for First Degree Robbery and Conspiracy, and arrested in 1994 for Attempted Robbery. On June 14, 2007, I spoke with San Diego County Deputy District Attorney Glen McCallister. McCallister told me that he prosecuted WILLIAMS following the 1994 arrest for attempted robbery, which resulted in an acquittal. McCallister told me that WILLIAMS' 1974 conviction resulted from WILLIAMS stealing cash from the San Diego Police athletic fund while working as a police officer. McCallister also told me the 1977 conviction for first degree robbery and conspiracy resulted from a residential burglary which WILLIAMS and another individual conducted while armed. Furthermore, McCallister told me that the 1994 arrest that resulted in an acquittal

10

AO 257 (Rev. 6/78)

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

**BY:** [X] COMPLAINT  [ ] INFORMATION  [ ] INDICTMENT  [ ] SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location:** NORTHERN DISTRICT OF CALIFORNIA

## OFFENSE CHARGED

18 U.S.C. 371 - Conspiring to commit an offense against the United States

[ ] Petty
[ ] Minor
[ ] Misdemeanor
[X] Felony

**PENALTY:** 5 years imprisonment, 3 years supervised release, $250,000 fine, $100 special assessment

### DEFENDANT - U.S.

▶ THOMAS RICHARD WILLIAMS and RAFAEL MIRANDA

**DISTRICT COURT NUMBER**

## PROCEEDING

**Name of Complaintant Agency, or Person (&Title, if any):** FBI

[ ] person is awaiting trial in another Federal or State Court, give name of court

[ ] this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

[ ] this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   [ ] U.S. Att'y  [ ] Defense

[ ] this prosecution relates to a pending case involving this same defendant

[ ] prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

SHOW DOCKET NO.

MAGISTRATE CASE NO.

**Name and Office of Person Furnishing Information on THIS FORM:** KEVIN V. RYAN
[ ] U.S. Att'y  [ ] Other U.S. Agency

**Name of Asst. U.S. Att'y (if assigned):** Michelle Morgan-Kelly

## DEFENDANT

**IS NOT IN CUSTODY**

1) [ ] Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) [ ] Is a Fugitive

3) [ ] Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) [X] On this charge

5) [ ] On another conviction

6) [ ] Awaiting trial on other charges  [ ] Fed'l  [ ] State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  [ ] Yes  [ ] No — If "Yes" give date filed

**DATE OF ARREST** ▶ Month/Day/Year: June 28, 2007

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year

[ ] This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**
[ ] SUMMONS  [ ] NO PROCESS*  [ ] WARRANT   **Bail Amount:**

If Summons, complete following:
[ ] Arraignment  [ ] Initial Appearance

**Defendant Address:**

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

**Date/Time:**

**Before Judge:**

**Comments:**

stemmed from another residential burglary that WILLIAMS was accused of commiting while armed.

V. **CONCLUSION**

38. For the reason stated above, I believe there is probable cause to support an application for a complaint and arrest warrants for THOMAS RICHARD WILLIAMS and RAFAEL MIRANDA for violating 18 U.S.C. § 371, conspiracy, in that WILLIAMS and MIRANDA conspired to receive and possess the two Ruger .22 caliber semi-automatic handguns with silencers bearing no serial numbers, which were not registered as required by 26 U.S.C. § 5861. I therefore respectfully request that the Court issue the requested arrest warrants.

DOUG HUNT
Special Agent, Federal Bureau of Investigation

Sworn to before me this
29 day of June, 2007

THE HONORABLE WAYNE D. BRAZIL
UNITED STATES MAGISTRATE JUDGE

11